DILL v. DILL.

4-7737                                  191 S. W. 2d 829

Opinion delivered December 3, 1945.

Rehearing denied January 7, 1946.

*Bruce Ivy,* for appellant.

*A. F. Barham,* for appellee.

GRIFFIN SMITH, Chief Justice. October 31, 1944, Johnnie Lee, Betty Jane, and Shirleen Dill were, respectively, fourteen, eleven, and nine years of age. Margaret R. and T. E. Dill—their mother and father—had separated. The husband's suit for divorce resulted in a favorable decree the following January. He was found to be ". . . a proper person to have the care and custody of such children," subject to the mother's right to visit them "at reasonable and proper times." The children were also authorized to visit their mother. Alimony of $50 per month was awarded, with directions that the plaintiff pay defendant's attorney the balance of a $400 fee.

By the appeal Margaret Dill seeks custody of the children and additional alimony, with appropriate allowances for maintenance of the minors.

Prior to her marriage to Dill in March, 1929, Margaret had been the wife of a man named Hall, by whom she had a daughter, Parmalee—now married, but only nineteen years of age when her deposition was taken in the case at bar.

When appellant and appellee first separated (January 12, 1944) they were living at Osceola in what had once been a luxurious residence. It was described as somewhat impaired by nearly thirty years of deterioration; but, according to G. L. Waddell who sold the home to Dill for $5,500, original cost was approximately $15,000.

Answering on cross-examination whether he had $50,000 in October, 1942, Dill said: "Well, I didn't, [but] the children did have—not that much, but they had 'a right smart little bit'—about $10,000 apiece, and they've still got it. I had $10,000 deposited to each of them; also $10,000 to my wife's credit. I took this out (it was in her name and mine) and paid my obligations."

Dill had previously testified that, when he married, his property consisted primarily of forty acres north of Highway No. 40. This was sold and another forty was bought "north of Alexander's." Dill purchased from the State certain tax forfeited lands, some of which—if not all—had been deeded to the children. Testimony is indefinite regarding the amount: whether 80 acres, 100, or more; nor is the value of this land satisfactorily shown. The home at Osceola was an estate by the entirety.

"Delta Queen," a roadhouse or "club" on Highway 61, was acquired by Dill during the latter part of 1935 or early in 1936. It was a place where "We danced, gambled, and drank." When asked to clarify this statement Dill replied, "I mean customers drank, gambled, and danced: I didn't."

But it seems conclusive that this personal denial is not entirely true. While the property was operated less than two years as a rendezvous for liberal entertainment, Mrs. Dill actively engaged in its management, notwithstanding the fact that the children were then eight years younger, and the mother was charged with their care—this in addition to the levies made upon one primarily in charge of a place of public reception, where drinks are sold and consumed.

Dill complained that his wife attended "parties" where unrestrained overtures were liquor-induced. Her friends, both men and women, were of the gay variety—individuals who had but little regard for social decorum; and flirtatious deportment occurred in circumstances most embarrassing. Mrs. Dill used liquor excessively, swore with pronounced emphasis, and sometimes applied vigorous epithets from a voluble vocabulary not lacking in the power of characterization nor indirect in respect of her husband's maternal lineage.

There was testimony that Mrs. Dill received letters from a soldier, bearing the salutation, "Dear Mom," and closing with the assurance that "love and kisses" were

being sent. But, in extenuation, it was disclosed that the young man in question was but twenty years of age when he joined the armed forces. He was a close family friend who had worked for the Dills. Envelopes bore name and return addresses; and they were directed to the street and house number where the Dills lived. When opened, these communications were left in conspicuous places. It was also insisted that they were intended for Parmalee, who was but slightly younger than the soldier.

After closing Delta Queen in 1937 the Dills continued for several years to live in the building. Private parties were given, miscellaneous guests were entertained, intoxication (or the condition immediately preceding it) lent vigor to the evening, and gambling was frequently engaged in.

An accusation directed to Mrs. Dill is that she was brought home one night—or, rather, early one morning —by a male neighbor. The man's wife, however, testified that her husband mentioned the incident; and, she continued, ''I didn't think anything about it.'' This witness, in discussing her own domestic affairs, said that when drunk she became possessed of an irresistible urge to fight with her husband. To this she added, ''We always fight.'' But Mrs. Dill, said the witness, did not drink to excess.

It is not necessary in this opinion to say whether Dill was, or was not, a ''professional'' gambler. That he was an habitual gambler is not disputed. He denies drinking to excess, but admits participation in designated affairs which strongly negative the presumption of sobriety. After filing his suit in January, Dill withheld affirmative action for several months, and in the meantime returned to the family home. He asserts that during this period conjugal relations did not exist; but Mrs. Dill just as positively swears that he either came to her room, or she went to his. During these visits sexual desires were accommodated, and past differences were either forgotten or forgiven.

In May, Mrs. Dill attended a party upon which appellee frowned. So, with return of the disobedient wife, doors were locked and windows were fastened. When Dill eventually appeared in response to the bell and other noises, he encountered Parmalee and her mother. He also ran into a barrage of flower pots and other paraphernalia intended as aids to entrance. Plate glass in the front door was broken, draperies were disarranged, and in other respects the premises bore mute evidence of family discord, plus material embellishment.

Eight hundred pages of testimony and pleadings deal with the husband's conduct upon the one hand and upon the wife's deportment upon the other. Dill concedes that when Margaret assisted him she was of exceptional value as a business aid, bookkeeper, and helpmate. During that period they made money and accumulated a substantial nestegg. While complaining that his wife drank, he admits sending her to a Negro (Will Bloom) for whisky; but, upon being recalled, testified, "I never sent her to Will Bloom's for whisky in my life." [1]

That neither the appellant nor appellee is entirely frank is clearly revealed when the testimony is compared and conduct of the principals is analyzed; and if interests of husband and wife were the only matters of consideration we would unhesitatingly affirm the decree because each, by personal behavior, has provoked the other to commit acts, or engage in excesses, inimicable to the relationship it was sought to create when marriage became a fact. Margaret cross complained and asked that a divorce be granted her, on the grounds of cruelty.

[1] There is the following testimony copied verbatim (except as to matters enclosed in brackets) from appellant's abstract, p. 85: "Q. The night you went out with Opal and Melvin Alexander: you say that is the night [Mrs. Dill] was drinking? A. Yes, sir—she knows where she got the whisky. Q. You sent her? A. I did—sent her over there [myself]. The reason for that was, [I] knew she was going around with parties I didn't approve of her going with, and having [drinks] charged. I just wanted to know for sure whether she would go. [I] paid for the liquor [later]. I told her to go to Willie Bloom and tell him to send me a quart of whisky."

Unfortunately, factors other than interests of T. E. and Margaret Dill are at stake—factors in which society has concern. Two of the three children testified for their mother; the other was not called. Neither, by any conspicuous evasion, sought to wholly justify the mother's outbursts of temper, or condone other acts unbecoming a parent. But the children are attached to her—even devoted; and these are ties that cannot be severed by a Chancellor's decree.

The education and so-called "lives" of these children must continue: their problems are to be dealt with, irrespective of the adversity brought on by parents. The father's proclivities for gambling and his propensities for diversions which kept him from home until. early morning, or for days; his crude custom of repeating smutty jokes in the presence of the girls (or, if testimony is to be believed, teaching them ribald songs); his penchant for physical satisfaction to the seeming exclusion of essentials—these things and other products of the stratum in which we find him fall short of supplying any guaranty that in his exclusive care three girls will be protected and their requirements met in the sense that the situation demands.

Nor, in awarding custody to the mother, are we satisfied that the sorry conduct admittedly pursued will be abandoned. We can only hope—and in the light of that hope earnestly urge—that a *home* in the truest sense be provided: a home closed to the pernicious contacts so clearly disclosed by the record at hand.

In deciding between the contending parties we attach importance to wishes of the children who unequivocally urge that they be allowed to live with their mother. Some witnesses say that while Margaret swears and sometimes drinks, profanity is not used around the girls, and that Margaret's drinking falls substantially short of intoxication. Other testimony is that the liberties she takes with liquor and with language is wholly unrestrained.

Perhaps somewhere between these two extremes the truth may be found. Be that as it may, the complaining husband knowingly provided conditions and supplied the instrumentalities in which the conduct and vices he now decries had birth or flourished.

Delta Queen was not acquired in consequence of any homemaking mission by Dill; nor was Margaret placed in charge of the club's sales, its accommodations, and its forms of amusement, merely as a means of promoting domestic tranquillity. When Dill chose to gamble in the forum he purchased, and when like diversions were sought elsewhere, he willingly entrusted to his wife full fellowship in meeting and serving all comers to Delta Queen; and if, as a wife, she is deficient, that delinquency was knowingly contributed to, in whatever form it occurred.

That part of the decree dealing with the divorce and custody of the children is reversed. The order granting appellee a divorce is set aside and the denial of appellant's prayer for divorce on cross appeal is affirmed. Custody of the children is given the mother with the right of visitation by the father at all reasonable times. The alimony allowance of $50 per month and an attorney's fee are affirmed; but, in addition, the monthly sums of $50 for each of Dill's three children are to be paid to Mrs. Dill for their maintenance, until such time as the principals compose their differences; or until, in a supplementary proceeding, the Chancellor is convinced that appellee's financial condition requires reconsideration of the awards aggregating $200 per month. It is so ordered.