Stella May WOOD v. Henry J. SWIFT, Trustee of
the T. E. (Dick) Dill Trust Estate et al

5-4527                                    428 S. W. 2d 77

Opinion delivered May 21, 1968

*Swift & Alexander,* for appellees.

J. FRED JONES, Justice. This is an appeal from a decree of the Mississippi County Chancery Court, Osceola District, dismissing a complaint filed by the appellant, Stella May Wood, to set aside a deed executed and delivered by her to T. E. Dill.

The appellant, Mrs. Wood, was 87 years of age at the time of trial. Her husband had been dead some thirty odd years and she had lived alone at her home in Luxora, Arkansas, since her only son was killed in line of duty as a federal prohibition officer in 1934. From about 1934, Mrs. Wood had owned, in her own right by inheritance and purchase, a 160 acre farm in Mississippi County. A part of the farm had been taken for highway purposes leaving 115.74 acres which Mrs. Wood leased for cash. T. E. Dill was some sixteen years younger than Mrs. Wood and he owned a farm of some 400 acres near Mrs. Wood's farm. In 1950 when Mrs. Wood was 70 years of age and Mr. Dill was 54, through the encouragement of mutual friends, they became acquainted with each other. Upon Mr. Dill's second or third visit with Mrs. Wood in 1950, he assured Mrs. Wood, upon inquiry, that he was divorced and not married, so their acquaintance quickly developed into deep affection attended by constant companionship.

In August 1960, Mrs. Wood conveyed the title in her farm to Mr. Dill by warranty deed, which, except for the description and covenants of warranty, recited as follows:

"                 WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS:

That I, Stella May Wood, a widow, for and in consideration of the sum of Ten ($10.00) Dollars to me in cash in hand paid by T. E. Dill, and other good

and valuable consideration had and received by me from him, and in consideration for invaluable services rendered and to be rendered me by Grantee, do hereby grant, bargain, sell and convey unto the said T. E. Dill, and unto his heirs and assigns forever, subject to the reservation hereinafter expressed, the following lands lying and being situated in the Osceola District of Mississippi County, Arkansas, to-wit:

\* \* \*

Grantor hereby expressly reserves unto herself during the full term of her natural life the right of possession and occupancy in and to the above described property and the rents and profits arising therefrom, it being her specific intention by this instrument to convey to the Grantee herein the full fee title to said real estate, subject only to the life estate herein reserved by her.

TO HAVE AND TO HOLD the same unto the said T. E. Dill, and unto his heirs and assigns forever, together with all and singular the tenements, appurtenances and hereditaments thereunto belonging or in any wise appertaining, subject to the life estate herein reserved in Grantor."

This deed was dated August 31, 1960, and was filed for record on September 2, 1960. It was prepared by Mrs. Wood's attorney upon Mrs. Wood's request and at Mr. Dill's direction. Mrs. Wood then went to her attorney's office and signed the deed. The deed was delivered to Mr. Dill after it was recorded and the relationship of the parties continued as before. About two and one-half years after the deed was executed and delivered, Mr. Dill suffered a heart attack and moved into the home with Mrs. Wood. About the time Mr. Dill moved into the home with Mrs. Wood, she executed a will devising her home, without remainder over, to Mr. Dill, and Mr. Dill also executed a will including all his real property in a testamentary trust for the benefit of his three

daughters and his grandchildren. On June 14, 1965, Mr. Dill died and after his death, Mrs. Wood filed the present action to set aside the deed for lack of consideration, mutual mistake, failure to conform to the intent of the parties as orally agreed, unilateral mistake, unjust enrichment, undue influence, fraud and duress.

Upon trial of the case, the chancellor dismissed the complaint for want of equity and upon appeal, Mrs. Wood designates the following points for reversal:

"The court erred in finding and holding that the plaintiff failed to carry the burden of proof in every instance and in dismissing plaintiff's complaint for want of equity and in failing and refusing to grant the relief prayed for in the complaint and amendment thereto.

The court erred in refusing to receive in evidence and consider in this case the Arkansas Supreme Court opinion in the *Dill* v. *Dill* case reported in volume 209 Arkansas Reports at pages 445, *et seq.*"

Primarily, a fact question was presented to the chancellor in this case and upon trial de novo in this court, we are of the opinion that the decree of the chancellor is not against the preponderance of the evidence.

Aside from the land involved here, the Dill estate was by no means insolvent. Mrs. Wood had one sister in a rest home in Missouri, and another in California at the time of Mr. Dill's death. Mrs. Wood had a brother living at the time the deed was executed, and according to her own testimony she told her brother that she intended to deed the property to Mr. Dill, but did not ask her brother's advice in the matter and did not advise him of the details of the transaction. The brother has since died, and the two sisters are her nearest relatives.

From appellant's own testimony, Mr. Dill made overtures to meet her in 1950 and she finally permitted

him to call on her. Upon her inquiry, he assured her that he had obtained a divorce and had been separated from his wife for six years. They quickly became very close friends and constant companions. According to Mrs. Wood's own testimony, Mr. Dill visited her several times a day, seven days a week, four weeks per month, and twelve months per year; and their relationship grew stronger as the years went by from 1950 when they met, to 1960 when she deeded the property to him, and that intimate relationship continued for an additional five years until Mr. Dill's death.

Concerning the execution of the deed, appellant testified:

"[M]y health was beginning to fade in 1960 and I was afraid I would not be able to carry on much longer and I worried quite a bit about it and Mr. Dill, in order to relieve me of all of these worries, offered to take over for me.

* * *

He offered to take over, look after the farm, see it was planted, collect the rents and see I got my rent and he would see I was taken care of if I got sick, he would see my doctor bills and medical bills were paid and I had a home as long as I lived. After my death—*we never figured I would out-live him*—after my death he was to collect the rents and divide the profits with my two sisters, my oldest sister is in Sikeston, Missouri in a nursing home and the other sister is in California. He was to divide the income between them and after their death he was to have full possession.

* * *

I decided I would rather give him a deed to it than leave it in a will because I was wanting to save him inheritance taxes. He would have to pay inheritance tax if he inherited through a will." (Emphasis supplied).

Appellant denied receiving the Ten Dollars consideration recited in the deed and contended that she intended, and that Mr. Dill knew, that their full agreement as to looking after and caring for her during her lifetime, and then paying the rents from the farm to her sisters during their lifetime, was to have been incorporated into the deed. Appellant's life estate was very clearly incorporated in the deed and certainly the chancellor could have concluded that ten years of close daily companionship, as testified by the appellant, would have included "services performed" as sufficient consideration to support a deed for the remainder following a life estate. According to appellant's testimony, she trusted Mr. Dill to have their entire agreement incorporated in the deed; she did not read the deed when she signed it, and after she delivered it to Mr. Dill, she did not see it again until after Mr. Dill's death on June 14, 1965, when she read the deed for the first time, and learned that all of their agreement was not incorporated in the body of the deed.

According to appellant's testimony on cross-examination, she had been receiving cash rent from her farm, but after the deed to Mr. Dill the land was leased on a crop rent basis, which enabled them to transfer the cotton allotment to more productive land. Mr. Dill went to the farm two or three times a week and appellant went with him on many occasions. Mr. Dill took appellant anywhere she wanted to go, and when Mr. Dill was on his way to Florida he was advised that appellant was ill and he returned without finishing his trip.

Mrs. Johnnie Meadows, one of the daughters of Mr. Dill, testified:

"Q. Did you or did you not know such a deed was in existence?

A. No, sir, I certainly don't know a thing about it.

Q. Did you, after your father's death, visit with Miss Stella?

A. Very often.

Q. During that period of time did you and she discuss this land and her getting it back?

A. On the telephone a few times we have. I don't think on visits we ever did.

Q. That was the only mention of that?

A. On the telephone we have discussed it.

Q. Did you offer to release your interest in these lands to her on the basis that you knew your father had not put any money in these lands or paid any consideration for them?

A. No, not on that basis because I didn't know about their business particularly.

Q. What was the basis?

A. Because Miss Stella and I have always been real good friends and that friendship means more than the money or the land.

Q. Do you know whether or not your father put any money in this land?

A. I have no idea."

A cousin of Mr. Dill's visited him in 1963, and was introduced to appellant. He testified as follows:

"Well, she showed me around her house and her flowers and Dick told her I was his cousin, used to work for him, used to live in Osceola and she

told me how fond she was of Dick and how much he helped her in her business, that she gave him that farm for what he had done for her, she wanted to do something for him, he had been so good to her, she didn't know what she would have done without him.

\* \* \*

. . . [S]he said he had really been good to her. She said, 'Now, I have been good to him too.' She went ahead to say she had somebody to stay there with her, he was not staying there regularly at that time, I don't think, but she enjoyed being with him, he had helped her so much with her business that she wanted to do something for him.''

Mr. Swift, an attorney and the trustee of the Dill estate, prepared a lease for Mr. Dill and Mrs. Wood and testified as follows:

''That was the first occasion I had met Mrs. Wood and she proceeded in the course of our discussion to tell me how Mr. Dill acquired the property, advised me she made him a gift of this property prior to this time and was very proud of it and gave me the reason for having done so. \* \* \* She was pleased to have made him a gift because of what he had done for her during their long relationship. She went into that relationship at great length. She was very proud of the fact Mr. Dill had brought some happiness to her. Always in Miss Stella's mind when I met with her were three paramount things that had stayed in her mind. One was upon her husband's death his family had beat her out of some property. That was always a constant bother to her. She was always obsessed with the anguish of having lost her son many years before and third, she was so pleased that after Mr. Dill came into her life she had somebody to look after her. \* \* \* She talked about the fact she had an income from it.

That's using her terminology. There was no doubt in her mind she had a life interest in the property."

Mr. Swift testified that Mrs. Wood had told him that she had given the land to Mr. Dill, reserving to herself a life estate; that the relationship between Mrs. Wood and Mr. Dill seemed to be more of a mother-son relationship; that Mrs. Wood had inquired as to whether she had successfully avoided inheritance tax in the execution of the deed; and that she had expressed satisfaction in the disposition of the property under the testamentary trust executed by Mr. Dill.

On recall, Mrs. Wood testified that about the time Mr. Dill moved into her home, she told Mr. Dill that she wanted to make a will, and how and why she wanted it made, and that she dictated her will to attorney Hyatt; that the will was prepared by him and in it she left her home and everything to Mr. Dill. In discussing the will, Mrs. Wood testified:

"Q. At the time the will was discussed, was any discussion had as to where he should live when he was managing these properties, the farm lands?

A. At my death he was to maintain the home and keep it for his own personal home, occupy it, I suppose.

Q. Where would it go at his death?

A. There was no provision made after his death.

Q. There were no strings attached to the house?

A. No, as long as he lived he was to maintain it as a home.

Q. Was that a part and parcel of the agreement you had at the time you delivered the deed?

A. No, this was not mentioned when I delivered the deed.''

In January 1945, Mr. Dill was granted a divorce from his wife by a decree of the Mississippi County Chancery Court and on appeal to this court the decree was reversed. *Dill* v. *Dill,* 209 Ark. 445, 191 S. W. 2d 829. The appellant contends that the chancellor erred in not admitting into evidence, and considering at the trial of this case, our opinion in the *Dill* case, *supra.* We are of the opinion that the chancellor was correct and committed no error on this point. There was no controversy in the case at bar concerning Mr. Dill's marital status at the time of his death and there is no contention that he was ever married, or ever proposed marriage, to the appellant. It is true that the appellant testified that Mr. Dill told her that he was divorced and that she believed him and had confidence in him. Appellant satisfied herself as to Mr. Dill's marital status on his second or third visit and it would appear that her confidence in him at that stage of their acquaintance was based more on infatuation, or desire for companionship, than on what Mr. Dill told her. On this point appellant testified as follows:

''A. There was one or two of my old friends, kind of gossipy, told me they heard he never had the divorce then I would approach him on the subject and he would deny it and tell me to quit worrying about that, that Judge Barham had got him a divorce and it was final.

       \*     \*     \*

Q. I believe you told people on various occasions you made this gift to Mr. Dill?

A. I don't remember bragging about it, I remember telling one or two of my closest friends I had fixed the deed, had it made out to him.

       \*     \*     \*

Q. Miss Stella, do you recall the heart attack Mr. Dill had?

A. Yes.

Q. You brought him from the hospital to your home?

A. Yes.

Q. That's when he began living with you?

A. Yes, two and a half years before he died. He had no home to go to and I offered him my spare room and he accepted it and he liked it so well he just stayed on.

Q. After you brought him from the hospital these so-called friends called you again and warned you he was not divorced?

A. I believe so."

We can see no connection between the character of Dill as it might have been revealed by the record in previous divorce proceedings, and the character of Dill and his overt acts in dealing with appellant during the ten years of their close association prior to the execution of the deed, and the additional five years after its execution and delivery as revealed in the record before us.

The record does not reveal the ages of appellant's sisters, but the record does reveal that no provision was made for them in the will appellant dictated to her attorney. The record does reveal, from appellant's own testimony, that it never occurred to her or Mr. Dill that she would outlive him, and the record also reveals, from appellant's own testimony, that the reason she conveyed the property by deed rather than a will, was to save Mr. Dill inheritance tax on the transaction.

We agree with appellant's contentions, and with the cases cited in support of them, that support deeds are

recognized in this state; that when a deed is executed in consideration of future support and maintenance and the grantee fails to fulfill the provisions of the deed, the grantor may sue at law for damages, or may sue in equity to cancel the deed for failure of consideration. We agree with the appellant that "the real consideration in a deed can always be shown by parole evidence." We also agree that a suit may be maintained in equity for revision of a deed for condition broken, the rationale of the doctrine being that an intentional **failure upon the** part of the grantee to perform the condition constituting the consideration for a deed, raises the presumption of fraudulent intention from the inception of the contract, and therefore vitiates the deed based upon such consideration. Such contracts are in a class peculiar to themselves, and where the grantee intentionally fails to perform the contract, the remedy by cancellation, as for fraud, may be resorted to regardless of any remedy the grantor may have had also at law. *Goodwin* v. *Tyson,* 167 Ark. 396, 268 S. W. 15. While reformation of a deed or contract for fraud or mistake is a proper matter for equitable jurisdiction, the burden of proving fraud, mistake or lack of consideration rests upon the one alleging it.

We conclude that the chancellor's finding that appellant failed to meet the burden of proof in the case at bar is not against the preponderance of the evidence, and that the decree of the chancellor should be affirmed.

Affirmed.